J-S01017-19

2019 PA Super 58

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NANCY ANN SEBOLKA | : | |
| | : | |
| Appellant | : | No. 321 MDA 2018 |

Appeal from the Judgment of Sentence January 10, 2018
In the Court of Common Pleas of Wyoming County Criminal Division at
No(s):  CP-66-CR-0000080-2016

BEFORE:  PANELLA, P.J., MURRAY, J., and PELLEGRINI*, J.

OPINION BY MURRAY, J.:                    **FILED FEBRUARY 25, 2019**

Nancy Ann Sebolka (Appellant) appeals from the judgment of sentence imposed after a jury found her guilty of two counts of endangering the welfare of a child (EWOC), two counts of corruption of minors, and two counts of criminal solicitation to commit simple assault.[1]  After careful review, we affirm Appellant's convictions, but vacate her judgment of sentence and remand for further proceedings consistent with this decision.

The trial court detailed the facts and procedural history of this case as follows:

> On or about November 24, 2015, the Meshoppen Borough Police Department arrested and subsequently charged [Appellant] with three (3) counts of [(EWOC)], 18 Pa.C.S. § 4304, a felony of the third degree, three (3) counts of corruption of minors, 18 Pa.C.S. § 6301, a misdemeanor of the first degree, three (3) counts of criminal solicitation/simple assault, 18 Pa.C.S. § [902]/18 Pa.C.S. § 2701, a misdemeanor of the second degree and two (2) counts of criminal conspiracy to commit simple

---

[1] 18 Pa.C.S.A. §§ 4304(a)(1), 6301(a)(1)(i), 2701(a)(1), 902(a).

*Retired Senior Judge assigned to the Superior Court.

assault. The basis of these charges were set forth in the Criminal Information[,] which stated, in pertinent part, that [Appellant] did knowingly endanger the welfare of three (3) juveniles, namely [L.B.], [K.L.B.], and [K.B.], by feeding them small amounts of food, making them work before they could eat, making them eat food they did not like as punishment, making them think of and carry out harsh and brutal punishments on each other, hitting them, locking them out of the house, making one of the male juveniles use a bucket outside as a bathroom, refusing to allow them in the house during the day, sleeping outside in a shed, making them walk around for hours, and all of the children were underweight, malnourished and had distended abdomens.

On November 13, 2017, the matter was tried by a jury. Prior to the commencement of the jury trial, Counsel for [Appellant] made an oral motion to dismiss one count of [(EWOC)], one count of corruption of minors and one count of criminal solicitation to commit simple assault on the basis that at the time of the preliminary hearing, the District Magistrate, after full hearing, did not bind over charges as they related to the youngest child, [L.B.]. The Commonwealth did not object to said motion and as such, the motion was granted. This issue was again addressed during the trial.

At the time of the trial, [K.L.B.], whose date of birth is [], was seventeen (17) years old and [a high school student] residing with his paternal grandparents, brother [K.B.] and sister [L.B.]. (H.T. 11/13/17, pp. 127-8). [K.L.B.]'s . . . biological mother . . . lives [out of state]. [K.L.B.]'s parents separated . . . and at that time [K.L.B.] and his siblings went to reside with their father at paternal grandparents' home.

Sometime in 2009, Father met [Appellant] and in or around August of 2012, Father and the children moved into [Appellant]'s home with [Appellant] and her eighteen (18) year old daughter, [].

*       *       *

Sometime after moving in with [Appellant], Father got a new job where he primarily worked the night shift and the children were left with [Appellant]. Because of his work schedule, Father slept most of the day. During the summer, [Appellant] and the children typically woke up between 10:00 am and noon and

- 2 -

[Appellant] would give each child half a cup of oatmeal for breakfast. [L.B.], who was twelve (12) years old at the time she gave her testimony, testified that she would wake up between eight or nine o'clock but that she was not allowed out of her room until [Appellant] woke around noon. [K.L.B.] and his siblings would eat breakfast together but [Appellant] would not allow them to speak.

*     *     *

Typically, the children were not allowed in the house, with the exception of [L.B.] to use the bathroom or to watch [Appellant]'s granddaughter. [Appellant] kept all of the doors to the house locked and the boys would go to the bathroom outside and defecate in a five-gallon bucket without wiping themselves.

[Appellant] would place a jug of water out for the children, together with three different colored cups. The children would often pick berries or wild onions for food. Dinner typically consisted of a salad or spaghetti and was served at 6:00 pm. Again, the siblings would eat dinner together without permission to speak. [L.B.] testified that the children would eat oatmeal around noon and have salad and/or chicken for dinner around six o'clock and those were the only times the children ate, except for picking berries outside. After dinner, the children would either go back outside or go to their bedrooms that did not have any light. They were not allowed to watch television. The children were allowed to shower two (2) to three (3) times per week.

*     *     *

During the school year, the children typically woke about a half hour before the bus arrived, were fed a half of a cup of oatmeal and provided a bag lunch of a sandwich, popcorn or pretzels, a piece of fruit and a water. [K.L.B.] testified that he usually ate his lunch on the bus ride to school because he was not fulfilled from the oatmeal. [K.L.B.] testified that he would often eat condiments for lunch, occasionally the lunch ladies would provide him with a lunch and he would take leftover fruit and/or milk from friends.

*     *     *

On several occasions, [Appellant] asked [K.L.B.] to punish his brother by hitting him and beating him up. In or around August of 2015, [K.L.B]'s brother, [K.B.], stole crackers or some sort of granola bar and [Appellant] found out about it. [K.B.], who was fourteen years old at the time he testified, testified that when [Appellant] realized the crackers were missing, she woke all of the children up at 2:00 am and when [K.B.] admitted to taking the crackers, [Appellant] forced [him] to walk outside in the rain for about twenty to thirty minutes. [Appellant also] punished [K.B.] by making him sand the deck of their home by hand.

\* \* \*

[K.B.] ran away from home on several occasions. On August 24, 2015 Cindy Miner (hereinafter "Ms. Miner") was working at D&C Fuel on Route 6 in Washington Township, Wyoming County as a shift supervisor for the night shift. When she arrived at work at approximately 9:15 pm, she noticed a small, dirty boy wearing torn up clothes trying to buy a bag of chips. Ms. Miner's cashier gave the boy the bag of chips and Ms. Miner then found the boy sitting on a picnic table bench and she approached him. Ms. Miner th[e]n made him chicken fingers and fries and the child ate the meal in its entirety. Ms. Miner then called 9-1-1 and Meshoppen Borough Chief of Police John Krieg (hereinafter "Chief Krieg") arrived.

Chief Krieg testified that when he first saw [K.B.], he . . . noticed his dirty and ripped clothing and that he had a cut on his knee. [K.B.] informed Chief Krieg that he got the cut because he told [Appellant] he did not want to sand the porch and so [Appellant] directed [K.L.B.] to punish [K.B.]. Chief Krieg contacted CYS and proceeded to [Appellant]'s house. Chief Krieg spoke with [Appellant] and directed [K.L.B.] to go outside. Thereafter, Chief Krieg attempted to speak with [K.L.B.] who was quiet and looking over his shoulder. Chief Krieg realized [Appellant] was staring at [K.L.B.] and so Chief Krieg directed her to wait inside with the door closed. After speaking with [K.L.B.], Chief Krieg learned that the children were not allowed to eat until their work was done. Chief Krieg took custody of all three children and then turned them over to Wyoming County Children and Youth Services (hereinafter "CYS"). While transporting the children, they asked if they could have food when they got to where they were going.

* * *

Megan Georgia (hereinafter "Ms. Georgia") is a school counselor . . . and testified that she provided counseling services to [K.L.B.] beginning in the 2011/2012 school year when he was brought to her office by cafeteria workers and staff members. Ms. Georgia had approximately four (4) or five (5) parent conferences with [Father] regarding academic issues, behavioral concerns and concerns about [K.L.B.] eating from a school garbage can. On a couple of occasions, Ms. Georgia assisted [K.L.B.] in cleaning out his locker. Cafeteria workers would frequently give [K.L.B.] food and he would store it in his locker. Often times, the food would begin to smell and so Ms. Georgia would assist [K.L.B.] in cleaning out the locker. Ms. Georgia testified that [Father] and [K.L.B.] participated in a CASSP meeting, which was an interagency meeting to get services in place for [K.L.B.] and to attempt to get [him] access to medical services.

* * *

Rebecca Grimaud Chilson (hereinafter "Dr. Chilson") [testified] as an expert in the field of pediatrics for the purposes of this trial on November 15, 2017. Both [K.L.B.] and [K.B.] were patients of Dr. Chilson. More specifically, [K.L.B.] came under Dr. Chilson's care on or about October 3, 2014. . . . During this visit, [K.L.B.] indicated to Dr. Chilson that his step-mother was not feeding him as much as he would like. Dr. Chilson stressed the importance of a well-balanced diet with [K.L.B.] and [Father].

Thereafter, on August 27, 2015[,] Dr. Chilson again saw [K.L.B.] when his foster parents and CYS brought all three children for an exam. Dr. Chilson noted [K.L.B.]'s distended abdomen and high-pitched bowel sounds that were abnormal. Dr. Chilson testified that this was a result of his gut being overwhelmed by the increased calorie and food intake, which is also known as refeeding syndrome. Formal counseling was recommended for the children, smaller and more frequent portions of food were recommended and child neglect was noted. [K.L.B.] was again seen by Dr. Chilson on September 18, 2015 to follow up on his elevated liver enzymes and low vitamin D levels. After another round of labs, Dr. Chilson noted that the laboratory results had [returned] to normal levels.

[K.B.] was also treated by Dr. Chilson and he first was seen on September 22, 2014[.] Dr. Chilson noted that [K.B.] was small for his age and therefore recommended increasing his caloric intake. [K.B.] was again seen on May 21, 2015 when his paternal grandmother brought him for a visit because his required sixth grade physical was overdue. [K.B.] informed Dr. Chilson of his home life and his hunger. As a result, Dr. Chilson placed a call with CYS to voice her concerns. [K.B.] was again seen on August 27, 2015 when he presented with his siblings, foster parents and CYS. [K.B.] explained to Dr. Chilson his reasons for running away on August 24, 2015. A heart murmur, which he did not have previously, was noted and an EKG and echo was recommended. [K.B.] also had elevated liver enzymes and low vitamin D levels. However, after repeat labs, these levels returned to normal levels.

On November 15, 2017, the jury returned verdicts of guilt against [Appellant] on the following criminal offenses:

a. Case No.: 2016-CR-80A, Endangering the Welfare of Children (F-3);

b. Case No.: 2016-CR-80B, Endangering the Welfare of Children (F-3);

c. Case No.: 2016-CR-80C, Corruption of Minors (M-1);

d. Case No.: 2016-CR-80D, Corruption of Minors (M-1);

e. Case No.: 2016-CR-80E, Criminal Solicitation to Commit Simple Assault (M-2); and

f. Case No.: 2016-CR-80F, Criminal Solicitation to Commit Simple Assault (M-2).

Thereafter on January 10, 2018, this [c]ourt . . . sentenced [Appellant] to an aggregate sentence of not less than twenty-one (21) months to not more than eighty-four (84) months in a state institution.

[Appellant] filed Post Sentence Motions, which were denied by Court Order dated January 19, 2018. [Appellant] then filed a Supplemental Post-Sentence Motion for Judgment of Acquittal and/or Arrest of Judgment and/or New Trial and to Modify or Reconsider Sentence, which was denied as moot by this [c]ourt

on January 22, 2018. [Appellant] filed a direct appeal to the Pennsylvania Superior Court[.]

Trial Court Opinion, 5/7/18, at 1-11 (record citations and footnote omitted).

On appeal, Appellant presents the following issues for review:

1. WAS THE COMMONWEALTH'S EVIDENCE INSUFFICIENT TO SUSTAIN GUILTY VERDICTS BEYOND A REASONABLE DOUBT AGAINST THE APPELLANT?

2. WERE THE VERDICTS AGAINST THE WEIGHT OF THE EVIDENCE?

3. DID THE COURT ERR BY ADMITTING PORTIONS OF THE TESTIMONY OF [L.B.], WHO WAS NOT A NAMED COMPLAINANT AT THE START OF THE TRIAL?

4. DID THE COURT ERR BY FAILING TO INSTRUCT JURY ON IGNORANCE OR MISTAKE OF FACT REGARDING THE CHARGE OF [EWOC]?

5. DID THE COURT ERR BY PRECLUDING CERTAIN TESTIMONY OF THE CHARACTER AND FACT WITNESSES, BOBBI JO KARPINSKI AND [K]RISTINA SEBOLKA, RESULTING IN PREJUDICE TO [APPELLANT]?

6. DID THE COURT ERR BY PRECLUDING THE ADMISSION OF RELEVANT EVIDENCE CONCERNING THE ELEVATED BMI AND OBESE CONDITION OF THE COMPLAINANT, [K.L.B.] FOLLOWING HIS REMOVAL FROM [APPELLANT'S] RESIDENCE IN 2015?

7. THE COURT ERRED BY STATING A PERSONAL OPINION ABOUT THE CREDIBILITY OF THE COMMONWEALTH'S EXPERT WITNESS DR. CHILSON.

8. DID THE COURT ABUSE ITS DISCRETION BY FAILING TO IMPOSE A SENTENCE PURSUANT TO THE RRRI ACT?

Appellant's Brief at 5-6.[2]

Appellant's first issues presents three distinct sufficiency of the evidence challenges. In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

***Commonwealth v. Franklin***, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted). Importantly, "the jury, which passes upon the weight and credibility of each witness's testimony, is free to

---

[2] We note that Appellant has abandoned her seventh issue in her appellate brief.

believe all, part, or none of the evidence." ***Commonwealth v. Ramtahal***, 33 A.3d 602, 607 (Pa. 2011).

First, Appellant challenges the sufficiency of the evidence with respect to her EWOC convictions. Section 4304(a)(1) defines EWOC as follows:

**(a) Offense defined.--**

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1).

Appellant asserts that the Commonwealth failed to prove that Appellant knowingly violated a duty of care as to either K.L.B. or K.B. Section 302(b) of the Pennsylvania Crimes Code states:

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b).

This Court has employed a three-prong test to determine whether the Commonwealth's evidence is sufficient to prove that a defendant knowingly violated a duty of care under Section 4304(a)(1):

> (1) the accused must be aware of his or her duty to protect the child; (2) the accused must be aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused either must have failed to act, or must have taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Smith*, 956 A.2d 1029, 1038 (Pa Super. 2008) (quotations and citations omitted).

Appellant contends that she made a "reasonable, legitimate mistake as to the necessary caloric intake requirements of children of varying ages, weights, heights, and body types." Appellant's Brief at 24. Additionally, Appellant maintains that the Commonwealth failed to prove that she was aware "that the complainants[] were in circumstances that could threaten their physical or psychological welfare and that [Appellant] has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect complainants' welfare." *Id.*

We disagree. The record is replete with evidence demonstrating that Appellant knowingly placed K.L.B. and K.B. in circumstances that threatened their physical or psychological welfare, and she took actions that could not reasonably be expected to protect the children's welfare. Contrary to Appellant's claims, the record reflects that K.L.B. and K.B. were severely underfed. Appellant fed the children a half cup of oatmeal for breakfast and a salad or spaghetti for dinner. N.T., 11/13/17, at 142-45; 11/14/17, at 18. Although the children took lunch with them to school, K.L.B. testified that he

- 10 -

ate his lunch on the way to school because he did not get enough for breakfast, which led him to eat condiments for lunch, get food from his friends or the cafeteria staff, or retrieve uneaten food from the garbage. N.T., 11/13/17, at 146-47; N.T., 11/14/17, at 234. When they were not in school, the children would often pick wild berries for food because they did not get enough to eat at home. N.T., 11/13/17, at 141, 193. K.L.B. and K.B. were so malnourished that after they were placed in foster care, they exhibited distended abdomens and high-pitched bowel sounds indicating that their bodies were overwhelmed by the increased food intake. N.T., 11/15/17, at 21, 30, 45. Both K.L.B. and K.B. had elevated liver enzymes and low vitamin D levels as a result of malnutrition. *Id.* at 22-23, 45-47. After several weeks in foster care, the boys' laboratory results returned to normal levels. *Id.* at 26, 47.

In addition to causing malnourishment, Appellant forced the children to live in an environment devoid of hygiene. Appellant forced K.L.B. and K.B. to defecate outdoors in a five-gallon bucket without toilet paper, N.T., 11/14/17, at 69-70, 87-88, 118-19, and only allowed them to shower one to three times a week. N.T., 11/13/17, at 145; N.T., 11/14/17, at 88, 124.

The record further reflects that Appellant inflicted psychological damage on the children. For example, the children were not allowed to speak during meals. N.T., 11/13/17, at 136. After dinner, Appellant permitted the children to either go back outside or go to their bedrooms, which did not have any light. N.T., 11/13/17, at 143-44. Perhaps worst, the record reveals that on

several occasions, Appellant forced K.L.B. to punish K.B., his younger brother, by beating him. N.T., 11/13/17, at 151-52, 194-95; N.T., 11/14/17, at 27, 71, 94-95.

We conclude, based on the overabundance of evidence in the certified record, that Appellant not only knowingly placed K.L.B. and K.B. in circumstances that threatened their physical or psychological welfare, but also deliberately acted in a manner that could not reasonably be expected to protect the children's welfare. Appellant's arguments to the contrary are entirely unavailing. Accordingly, Appellant's challenge to the sufficiency of the evidence relating to her EWOC convictions is meritless.

Second, Appellant challenges the sufficiency of the evidence with respect to her corruption of minors convictions. Section 6301(a)(1)(i) of the Pennsylvania Crimes Code provides:

**(a) Offense defined.--**

(1)(i) Except as provided in subparagraph (ii), whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, commits a misdemeanor of the first degree.

18 Pa.C.S.A. § 6301(a)(1)(i). "Actions that tend to corrupt the morals of a minor are those that would offend the common sense of the community and the sense of decency, propriety and morality which most people entertain."

***Commonwealth v. Snyder***, 870 A.2d 336, 351 (Pa. Super. 2005) (quotations and citations omitted).

Appellant's corruption of minors convictions stem from her demands that K.L.B. strike K.B. whenever Appellant perceived that K.B. misbehaved. Appellant asserts that the Commonwealth "failed to establish that [she] acted in a manner to corrupt the morals of [the] complainants." Appellant's Brief at 26. Specifically, Appellant contends that because her instructions to K.L.B. "were only to strike [K.B.] rather than give a savage beating[,]" that the evidence is insufficient to sustain her corruption of minors convictions. ***Id.***

At the outset, we note that Appellant admits that she instructed K.L.B. to strike K.B. Appellant's Brief at 26. Without question, Appellant's demands that K.L.B. beat K.B., his younger brother, to the point of bruising K.B., and her insistence that K.B. receive these beatings, constitute actions that offend the common sense of the community and the sense of decency, propriety and morality that most people entertain. ***See Snyder***, 870 A.2d at 351. Thus, this concession alone is sufficient to sustain Appellant's corruption of minors convictions, as Appellant's actions in this respect speak for themselves. Moreover, Appellant's assertion that the evidence is insufficient to sustain her corruption of minors convictions because she only instructed K.L.B. to hit K.B. and did not ask him to give K.B. a "savage beating," not only strains credulity,

but is also unsupported by any authority. Accordingly, we conclude that Appellant's challenge to her corruption of minors convictions is meritless.[3]

Third, Appellant challenges the sufficiency of the evidence with respect to her solicitation to commit simple assault convictions. Section 902(a) of the Pennsylvania Crimes Code defines solicitation as follows:

> **(a) Definition of solicitation.--**A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission.

18 Pa.C.S.A. § 902(a). Section 2701 states that "a person is guilty of assault if he . . . attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1). "Bodily injury" is any "impairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301.

Appellant does not dispute that she on multiple occasions instructed K.L.B. to beat K.B. Instead, she asserts that the use of force was justified under Section 509 of the Pennsylvania Crimes Code as a disciplinary action.

_____

[3] Additionally, with respect to K.L.B., Appellant concedes that she encouraged K.L.B. to commit the crime of simple assault. Section 2701 of the Pennsylvania Crimes Code states that "a person is guilty of assault if he . . . attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1). "Bodily injury" is any "impairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301. The record clearly reflects, and Appellant admits, that on numerous occasions she instructed K.L.B. to hit K.B. and that K.B. suffered bruising as a result. N.T., 11/13/17, at 151-52, 194-95; N.T., 11/14/17, at 27, 71, 94-95. Thus, we could sustain Appellant's corruption of minors convictions on this basis.

We disagree. Section 509 provides, in pertinent part, as follows:

The use of force upon or toward the person of another is justifiable if:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:

(i) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct; and

(ii) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation.

18 Pa.C.S.A. § 509(1).

As Section 509 plainly states, the defense of justification is only available where the "the force is used for the purpose of safeguarding or promoting the welfare of the minor" and "is not designed to cause or known to create . . . mental distress or gross degradation." *Id.* Appellant's actions in this case do not fit within the constructs of Section 509(1). Given that Appellant asked K.L.B. to beat K.B. and laughed when he did, *see* N.T., 11/13/17, at 151-52, the application of force was in no way meant to promote the welfare of K.B. and was clearly designed to cause pain, mental distress, and degradation. *See* N.T., 11/13/17, at 151-52, 194-95; N.T., 11/14/17, at 27, 71, 94-95. Accordingly, Appellant's challenge to her solicitation to commit simple assault convictions is meritless.

For her second issue, Appellant argues that the trial court erred in denying her post-sentence motion in which she argued that her verdicts were against the weight of the evidence. Specifically, Appellant bases her weight claim on the assertion that the testimony of K.L.B., L.B., and K.B. was unreliable because they were children having difficulty dealing with separation from their biological mother, and because they failed to report their allegations of abuse in a timely fashion.

Our standard of review for a claim that the verdict was against the weight of the evidence is as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Widmer***, [] 744 A.2d 745, 751-52 ([Pa.] 2000); [***Commonwealth v. Brown***, 648 A.2d 1177, 1189 (Pa. 1994)]. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" [***Id.***] (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 648 A.2d at 1189.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

>> *Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* ***Brown***, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and

- 16 -

> see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 744 A.2d at 753 (emphasis added).

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013).

As set forth in our discussion of Appellant's sufficiency claims, the consistent testimony of the three children, their school counselors, and Dr. Chilson, indicates that Appellant: withheld food from K.L.B. and K.B., made K.L.B. beat K.B., locked the children out of the house, made the boys use a bucket outdoors for their toilet, limited bathing to a few times per week – causing the children behavioral and physical problems, including, *inter alia*, malnourishment, distended abdomens, elevated liver enzymes and insufficient vitamin D. Thus, contrary to her assertions, Appellant's multiple convictions of EWOC, corruption of minors, and criminal solicitation to commit simple assault, in no way shock one's sense of justice. The trial court did not abuse its discretion in determining that the verdicts were consistent with the weight of the evidence.

For her third issue, Appellant argues that the trial court abused its discretion in allowing L.B. to testify about Appellant's mistreatment of L.B. and her siblings. Appellant asserts that because L.B. was not a named

complainant under any of the charges, her testimony was irrelevant and prejudicial.

> Our standard of review is as follows:
>
> It is well settled that the admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Hicks*, 151 A.3d 216, 224 (Pa. Super. 2016) (quotations, citations and brackets omitted), *appeal denied*, 168 A.3d 1287 (Pa. 2017).

As our Supreme Court has explained, generally, "all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility." *Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007). "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.Evid. 403 (comment).

Appellant's trial counsel objected to three questions during the Commonwealth's direct examination of L.B. – whether L.B. lost weight under Appellant's care, how L.B. felt when she was hungry, and whether she had experienced stomach pains. N.T., 11/14/17, at 29-35. Of these three questions, L.B. only responded to the first, indicating that she had lost weight under Appellant's care. *See id.* Not only was this testimony relevant, as it tended to corroborate the claims regarding Appellant's withholding of food, but Appellant's assertion that L.B.'s answer to this one question unfairly prejudiced her and diverted the jury's attention away from its duty of weighing the evidence impartially, is tenuous at best. Accordingly, we conclude that the trial court did not abuse its discretion in permitting L.B.'s testimony.

For her fourth issue, Appellant argues that the trial court erred in declining to provide the jury with a mistake of fact instruction. Specifically, Appellant asserts that she was entitled to a mistake of fact instruction on her EWOC charge because she did not knowingly fail to provide the children with enough food to satisfy their daily caloric intake requirements, but rather was mistaken and unaware of how much food they needed on a daily basis.

The standard of review regarding the denial of a jury instruction is well settled. "Our standard of review when considering the denial of jury instructions is one of deference – an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 985 A.2d 783, 799 (Pa. 2009).

Section 304 of the Pennsylvania Crimes Code, which governs the defense of mistake of fact, provides:

Ignorance or mistake as to a matter of fact, for which there is reasonable explanation or excuse, is a defense if:

(1) the ignorance or mistake negatives the intent, knowledge, belief, recklessness, or negligence required to establish a material element of the offense; or

(2) the law provides that the state of mind established by such ignorance or mistake constitutes a defense.

18 Pa.C.S.A. § 304.

This Court has explained the mistake of fact defense as follows:

It is well established that a bona fide, reasonable mistake of fact may, under certain circumstances, negate the element of criminal intent. 18 Pa.C.S.A. § 304 (providing, *inter alia*, that ignorance or mistake as to a matter of fact, for which there is a reasonable explanation or excuse, is a defense if "the ignorance or mistake negatives the intent, knowledge, recklessness, or negligence required to establish a material element of the offense")[.] It is not necessary that the facts be as the actor believed them to be; it is only necessary that he have a bona fide and reasonable belief in the existence of facts which, if they did exist, would render an act innocent.

***Commonwealth v. Scott***, 73 A.3d 599, 603 (Pa. Super. 2013) (quotations and citations omitted).

We conclude that the trial court did not abuse its discretion in declining to instruct the jury on the mistake of fact defense. Appellant is both a parent and a grandparent. At trial, Appellant professed her passion for nutrition, and the children's father indicated that Appellant had read books and magazines on the subject. N.T., 11/15/17, at 216-17, 297. Additionally, as discussed

extensively above, K.L.B. and K.B. were underfed to the point that their health was jeopardized. Appellant's assertion that she made a mistake of fact as to how much she needed to feed K.L.B. and K.B., and that this alleged mistake is a reasonable explanation for their malnourishment, is completely unavailing. As a parent and grandparent with a self-professed interest in nutrition, Appellant could not have possessed a bona fide and reasonable belief that she was providing the children with enough food. *See Scott*, 73 A.3d at 603. Accordingly, the trial court properly declined to provide the jury with an instruction on the mistake of fact defense.

For her fifth issue, Appellant argues that the trial court abused its discretion by precluding the eyewitness testimony of Bobbi Jo Karpinski (Karpinski), Appellant's sister, and Kristina Sebolka (Sebolka), Appellant's daughter. Appellant asserts that their testimony was relevant because it would have revealed their personal observations of the home, meals, and familial interactions, and would have contradicted the Commonwealth's theory of guilt with respect to the crimes charged. In response, the Commonwealth argues that the trial court appropriately limited Karpinski's and Sebolka's testimony to character evidence because Appellant had violated Pennsylvania Rule of Criminal Procedure 573 by failing to disclose the names and addresses of the eyewitnesses.

Rule 573 provides, in relevant part, as follows:

**(C) Disclosure by the Defendant.**

(1) In all court cases, if the Commonwealth files a motion for pretrial discovery, upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable, the court may order the defendant, subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to inspect and copy or photograph any of the following requested items:

\* \* \*

(b) the names and addresses of eyewitnesses whom the defendant intends to call in its case-in-chief, provided that the defendant has previously requested and received discovery under paragraph (B)(2)(a)(i).

\* \* \*

**(E) Remedy.** If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573(C)(1)(b), (e).

In rejecting Appellant's claim, the trial court explained:

Counsel for [Appellant] called [Appellant]'s daughter, [Kristina] Sebolka, and [Appellant]'s sister, Bobbi Jo Karpinski to testify. (H.T. 11/15/17, pp. 230, 303). During each witness' testimony, Counsel for the Commonwealth made an objection. (H.T. 11/15/17, pp. 233-236, 304-311). The Commonwealth made a discovery request to the defense asking for the identification of any eye witnesses the defense intended to call at trial. [Appellant] never provided a list to the Commonwealth. As a result, these witnesses' testimony was limited to character testimony[] only.

Trial Court Opinion, 5/7/18, at 14.

On June 13, 2017 (approximately five months prior to trial), the Commonwealth filed a Rule 573 motion, which the trial court granted the

following day. Appellant, however, never provided the Commonwealth with the names and addresses of the eyewitnesses she intended to call at trial. The trial transcript indicates that it was the Commonwealth's understanding that, consequently, Appellant had called Karpinski and Sebolka as character witnesses only. N.T., 11/15/17, at 233-36, 304-10. When Appellant's counsel began to treat them as eyewitnesses, the Commonwealth objected, and the trial court sustained the objection based on Appellant's violation of Rule 573(C)(1)(b). **Id.** Appellant fails, in any manner, to refute the trial court's determination that she violated Rule 573. Accordingly, we conclude that the trial court did not abuse its discretion in limiting Karpinski and Sebolka's testimony to character evidence. **See** Pa.R.Crim.P. 573(E).

For her sixth issue, Appellant argues that the trial court abused its discretion in denying her request to introduce evidence of K.L.B.'s Body Mass Index (BMI) both before and after the time he lived with Appellant. Appellant asserts that this testimony was admissible under the *res gestae* exception to show that K.L.B. had struggled with his health prior to living with Appellant and she was merely helping him to lose weight.

The *res gestae* exception "to the general proscription against **evidence of other criminal acts** is also known as the 'complete story' rationale, as such evidence is admissible in order 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" **Commonwealth v. King**, 959 A.2d 405, 417 n.3 (Pa. Super. 2008)

(emphasis added and citations omitted). Evidence subject to this exception is admissible only "where the probative value of the evidence outweighs the tendency to prejudice the jury." *Id.*

In rejecting this claim, the trial court explained:

While Dr. Chilson was testifying, Counsel for [Appellant] wanted to question Dr. Chilson about the records of Dr. Diamond, the children's current pediatrician and the pediatrician for the children prior to moving into [Appellant]'s home. Dr. Chilson indicated that she had not seen those records. (H.T. 11/15/17, p. 64). An objection was made by the Commonwealth on the basis that Counsel for [Appellant] was attempting to have Dr. Chilson testify regarding Dr. Diamond's records, specifically [K.L.B.]'s body mass index (hereinafter "BMI") from October of 2015 through October of 2016. (H.T. 11/15/17, pp. 65-84). Counsel for [Appellant] wanted to introduce records that reflect that prior to moving to [Appellant]'s residence, [K.L.B.] had a BMI of 99 and that at the time of trial, [K.L.B.] had a BMI of 98, in order to suggest that [K.L.B.] was grossly overweight. Counsel for [Appellant] argued that this evidence was relevant to show that the child had a problem with food and that [Appellant] was simply helping the child lose weight. (H.T. 11/15/17, pp. 73-5). Counsel for [Appellant] was permitted to question Dr. Chilson about the children's BMI prior to moving in with [Appellant]. However, this [c]ourt held that the children's BMI approximately one year after they were removed from [Appellant]'s home was not relevant.

Trial Court Opinion, 5/7/18, at 14-15.

Preliminarily, we point out that contrary to Appellant's claims, the trial court did permit her to question Dr. Chilson regarding K.L.B.'s BMI prior to the time he lived with Appellant. *See* N.T., 11/15/17, at 73-75. Regarding the *res gestae* exception, Appellant's claim is nonsensical, as evidence of K.L.B.'s BMI in no way fits with the definition of the rule because it is not evidence of a prior crime. Moreover, we note that Appellant cites no authority to support

- 24 -

her claim that this evidence is admissible under the *res gestae* exception. Therefore, the trial court did not abuse its discretion in declining to admit evidence of K.L.B.'s BMI after he no longer lived with Appellant.

Finally, Appellant argues that the trial court erred in failing to find Appellant eligible for the Recidivism Risk Reduction Incentive (RRRI) program, 61 Pa.C.S.A. §§ 4501-4512. Appellant contends that the trial court wrongly concluded that her conviction for solicitation to commit simple assault precluded her from receiving status as an eligible offender under the RRRI Act.

The question of whether a defendant is RRRI eligible "presents a question of statutory construction and implicates the legality of the sentence imposed." **Commonwealth v. Quiles**, 166 A.3d 387, 392 (Pa. Super. 2017) (quotations and citation omitted). "Therefore, our standard of review is *de novo* and the scope of our review is plenary." **Id.** (quotation and citation omitted).

Appellant's RRRI claim presents a question of statutory interpretation. "Generally speaking, under the rule of lenity, penal statutes are to be strictly construed, with ambiguities resolved in favor of the accused." **Commonwealth v. Lynn**, 114 A.3d 796, 818 (Pa. 2015). Our Supreme Court has explained:

> In matters involving statutory interpretation, the Statutory Construction Act directs courts to ascertain and effectuate the intent of the General Assembly. 1 Pa.C.S. § 1921(a). A statute's plain language generally provides the best indication of legislative

intent. In construing the language, however, and giving it effect, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.

The United States Supreme Court also takes a contextual approach in assessing the plain language of statutes and in determining if an ambiguity exists. *See generally King v. Burwell*, [] 135 S .Ct. 2480, 2489 [] (2015) ("If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning – or ambiguity – of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks and citations omitted)); *Yates v. United States*, [] 135 S. Ct. 1074, 1081-82 [] (2015) ("'[T]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." (internal citations omitted)).

*Commonwealth v. Giulian*, 141 A.3d 1262, 1267-68 (Pa. 2016) (some citations omitted or modified).

The RRRI program "permits offenders who exhibit good behavior and who complete rehabilitative programs in prison to be eligible for reduced sentences." *Commonwealth v. Hansley*, 47 A.3d 1180, 1186 (Pa. 2012). Section 4503 defines an "eligible offender," in relevant part, as follows:

**"Eligible offender."** A defendant or inmate convicted of a criminal offense who will be committed to the custody of the department and who meets all of the following eligibility requirements:

(1) Does not demonstrate a history of present or past violent behavior.

2) Has not been subject to a sentence the calculation of which includes an enhancement for the use of a deadly weapon as defined under law or the sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing or the attorney for the Commonwealth has not demonstrated that the defendant has been found guilty of or was convicted of an offense involving a deadly weapon or offense under 18 Pa.C.S. Ch. 61 (relating to firearms and other dangerous articles) or the equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation.

(3) Has not been found guilty of or previously convicted of or adjudicated delinquent for or an attempt or conspiracy to commit a personal injury crime as defined under section 103 of the act of November 24, 1998 (P. L. 882, No. 111), known as the Crime Victims Act, except for an offense under 18 Pa.C.S. § 2701 (relating to simple assault) when the offense is a misdemeanor of the third degree, or an equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation.

(4) Has not been found guilty or previously convicted or adjudicated delinquent for violating any of the following provisions or an equivalent offense under the laws of the United States or one of its territories or possessions, another state, the District of Columbia, the Commonwealth of Puerto Rico or a foreign nation:

18 Pa.C.S. § 4302(a) (relating to incest).

18 Pa.C.S. § 5901 (relating to open lewdness).

18 Pa.C.S. Ch. 76 Subch. C (relating to Internet child pornography).

Received a criminal sentence pursuant to 42 Pa.C.S. § 9712.1 (relating to sentences for certain drug offenses committed with firearms).

Any offense for which registration is required under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders).

(5) Is not awaiting trial or sentencing for additional criminal charges, if a conviction or sentence on the additional charges would cause the defendant to become ineligible under this definition.

(6) Has not been found guilty or previously convicted of violating section 13(a)(14), (30) or (37) of the act of April 14, 1972 (P.L. 233, No. 64),2 known as The Controlled Substance, Drug, Device and Cosmetic Act, where the sentence was imposed pursuant to 18 Pa.C.S. § 7508(a)(1)(iii), (2)(iii), (3)(iii), (4)(iii), (7)(iii) or (8)(iii) (relating to drug trafficking sentencing and penalties).

61 Pa.C.S.A. § 4503.

Upon review, we conclude that the trial court erred in failing to designate Appellant RRRI-eligible. The trial court determined that Appellant was not RRRI-eligible based on Subsection (3) of Section 4503 because of her "conviction[s] of simple assault[,]" which were graded as second-degree misdemeanors. Trial Court Opinion, 5/7/18, at 16. Appellant, however, was not found guilty of simple assault, but rather was convicted of **solicitation** to commit simple assault. Subsection (3) plainly states that in order for a defendant to be RRRI-eligible, he or she must not have "been found guilty of or previously convicted of or adjudicated delinquent for or an **attempt** or **conspiracy** to commit a personal injury crime[,]" such as the crime of simple assault when graded as at least a second-degree misdemeanor. **See** 61 Pa.C.S.A. § 4503. Thus, because Subsection (3) does not include the crime of solicitation, we are bound by the plain language, and solicitation to commit

- 28 -

a personal injury crime cannot preclude a criminal defendant from RRRI-eligibility. *See Giulian*, 141 A.3d at 1267-68. Accordingly, the trial court improperly determined that Appellant was not RRRI-eligible based on her solicitation to commit simple assault convictions.

The Commonwealth argues that Appellant is not RRRI-eligible based on Subsection (1) of Section 4503 because her convictions of solicitation to commit simple assault demonstrates a history of present or past violent behavior. Although the behavior underlying Appellant's solicitation to commit simple assault is reprehensible, the Commonwealth does not cite, and our research did not produce, any legal authority to indicate that solicitation to commit a personal injury crime demonstrates "a history of present of past violent behavior" under Section 4503. As our Supreme Court has explained, "Section 4503's list of disqualifying offenses . . . include[s] both violent and potentially non-violent crimes[,]" which "suggests the Legislature did not intend for *all* crimes of violence to be disqualifying in and of themselves." *Commonwealth v. Cullen-Doyle*, 164 A.3d 1239, 1243-44 (Pa. 2017) (quotations and citations omitted; emphasis in original). Therefore, we hold that Subsection (1) does not preclude Appellant's RRRI-eligibility in this case.

Based on the foregoing, we affirm Appellant's convictions, but vacate her judgment of sentence and remand for further proceedings consistent with this decision.

Judgment of sentence affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>02/25/2019</u>